STATE OF NEBRASKA, APPELLEE, V.
MICHELLE LEIBHART, APPELLANT.
662 N.W.2d 618

Filed June 13, 2003.   No. S-02-751.

134

Pamela P. Beck, of Beck Law Office, for appellant.

Jon Bruning, Attorney General, and Kevin J. Slimp for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

MILLER-LERMAN, J.

## NATURE OF CASE

Michelle Leibhart was convicted in the district court for Buffalo County of first degree assault and was sentenced to 1 to 3 years' imprisonment. Leibhart was charged with assaulting an 18-month-old child who was in her care, and at trial, the State, over Leibhart's objection, presented expert testimony to the effect that the child's injury was consistent with shaken baby syndrome. Leibhart appeals her conviction. We affirm.

## STATEMENT OF FACTS

Leibhart provided daycare in her home in Kearney, Nebraska, for three children, including the victim, Emily V. On November 10, 2000, Emily's mother dropped her off at Leibhart's home at approximately 7:50 a.m. Leibhart had provided daycare for Emily since shortly after Emily's birth on April 23, 1999. Leibhart's husband was home from work on November 10 and was present when Emily was dropped off. He left the home and was gone from approximately 8:30 until 9:30 a.m. and then left

again sometime before 10 a.m. with the Leibharts' son for haircuts. When Leibhart's husband returned around 11 a.m., there were emergency vehicles at the house.

At approximately 10:55 a.m., Sharon Waller, who lived across the street from the Leibharts, heard her doorbell ring. When she got to the door, she saw Leibhart walking back across the street, crying and carrying a small child cradled in her arms. Waller noticed that the child appeared to be " 'lifeless' " and therefore called the 911 emergency dispatch service for help. When emergency personnel arrived, they found Leibhart sitting on her porch holding Emily. Leibhart told emergency personnel she did not know what was wrong with Emily. Emily was then transported to Good Samaritan Hospital in Kearney.

At the hospital, Emily was examined by her pediatrician, Dr. Kenton Shaffer. Shaffer determined that Emily had suffered a brain injury, and a CAT scan revealed bleeding and swelling on the left side of her brain. Emily was flown to Children's Hospital in Omaha, Nebraska, for further emergency care. At Children's Hospital, Emily was treated by Dr. Michael Moran. Emily was in intensive care at Children's Hospital for approximately 3 weeks and remained at Children's Hospital for an additional week. Emily then spent several weeks in rehabilitation at Madonna Rehabilitation Hospital in Lincoln, Nebraska. Emily suffered permanent impairment as a result of the brain injury.

On November 13, 2000, two Kearney police officers interrogated Leibhart at the Buffalo County Law Enforcement Center. Leibhart was informed of her *Miranda* rights, and the officers questioned her for approximately 1 hour regarding the events of November 10. The interrogation ended when the officers asked Leibhart whether she had shaken Emily and Leibhart invoked her right to an attorney.

The investigation continued, and on August 20, 2001, the State filed an information charging Leibhart with first degree assault and alleging that on November 10, 2000, Leibhart had intentionally or knowingly caused serious bodily injury to Emily. Prior to trial, on March 20, 2002, Leibhart filed a motion in limine seeking to exclude evidence to the effect that Emily's injury was the result of shaken baby syndrome. Leibhart asserted that the theory of shaken baby syndrome as a cause of

certain injuries was not supported by reliable scientific authority, data, or research.

Trial began on April 17, 2002. The State called Emily's parents as witnesses. Emily's father testified that on the evening of November 9, 2000, Emily had bumped the top of her head when she was crawling underneath a table and stood up. He testified that she appeared to be fine afterward and that he did not know of any other accidents or injuries to Emily that night. Emily's mother testified that she dropped Emily off at Leibhart's house on the morning of November 10. She testified that Emily appeared to be fine that morning and did not appear to be suffering any effects from bumping her head the night before. When Emily's mother left Emily with Leibhart, Emily was "kinda fussy" but went willingly to Leibhart. Emily's mother was at the Leibhart house for only a few minutes, and the only adults she observed at the house were Leibhart and Leibhart's husband.

The State called Shaffer as a witness. Shaffer testified regarding his qualifications and his examination of Emily when she was brought to Good Samaritan Hospital on November 10, 2000. He testified that from observing her physical condition, he concluded that she had suffered a brain injury, and a CAT scan showed bleeding and swelling on the left side of her brain.

The State questioned Shaffer regarding his review of MRI and CAT scan information that was subsequently provided to Shaffer by Children's Hospital. When the State asked Shaffer whether his review of such information enabled him to form an opinion as to the nature or cause of Emily's injury, Leibhart objected "on the basis of foundation," stating "[w]e don't have sufficient foundation to answer that question." The district court overruled Leibhart's foundational objection, and Shaffer testified that Emily had suffered shaken baby syndrome. Shaffer elaborated by testifying that the injury indicated that Emily had been shaken in a manner such that the brain was shaken back and forth and that small blood vessels and nerve cells in the brain were torn. He testified that there was diffuse brain injury which was indicative of shaking, as opposed to trauma from something such as a fall or a hit to the head which would result in a more localized injury. Shaffer also testified that the shaking need not be forceful or for a long period of time for the shaking

to cause the injury from which Emily suffered. Shaffer testified that he saw no signs of external injuries or bruising or evidence of blunt trauma on the outside of Emily's head. Shaffer finally testified that symptoms of shaken baby syndrome would have manifested themselves within minutes of the precipitating event.

The State presented other witnesses. The State's final witness was Moran. Prior to Moran's testimony, Leibhart requested a hearing outside the jury's presence to consider the scientific reliability of the shaken baby syndrome theory. A hearing was conducted pursuant to *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), in which we adopted the principles set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), with respect to expert testimony.

At the hearing, Moran testified regarding his qualifications as a pediatrician and, in particular, his training with respect to shaken baby syndrome. He testified that clinical studies had been conducted to study shaken baby syndrome and that shaken baby syndrome was a scientifically recognized medical diagnosis within the pediatric community. Neither the State nor Leibhart presented any evidence other than Moran's testimony at the hearing. At the conclusion of the hearing, the district court found that shaken baby syndrome "ha[d] been clinically tested" and that "it is generally accepted within the scientific medical community of pediatrics." The court therefore ruled that Moran's testimony was admissible and that testimony concerning shaken baby syndrome would be received.

The jury then returned, and Moran testified before the jury regarding his qualifications. Moran described the features of shaken baby syndrome and explained shaken baby syndrome in terms of general causation. When the State asked for Moran's opinion as to the nature and cause of Emily's injury, Leibhart objected on the basis that there was "not sufficient foundation to give us an opinion." The court overruled the objection. With respect to specific causation, Moran testified that Emily's injury was consistent with shaken baby syndrome and that there was no other explanation for her injury. He testified that the injury could not have been caused by a bump on the head or a fall from a couch and that the shaking that resulted in her injury could not

have been done by another child. He further testified that the injury could have resulted from as little as 3 to 10 seconds of shaking and that the symptoms of the injury would have manifested themselves within minutes.

In her defense, Leibhart presented various witnesses who gave testimony to the effect that they knew Leibhart, that they had not known her to be abusive to children, and that they would have confidence placing a child in her care. Leibhart also testified in her own defense. She testified that after Emily's mother dropped Emily off on November 10, 2000, Emily was playing with Leibhart's 2½-year-old son. When Emily tried to take a telephone away from Leibhart's son, he got mad and hit her on the head with the telephone a few times. This incident happened around 8:30 a.m., and after Leibhart's husband and son left for haircuts, Leibhart was the only adult in the house with Emily and two other children. At around 10 a.m., Emily had been playing with the other children but then came over to Leibhart and laid her head on Leibhart's leg. Leibhart thought Emily appeared tired, so she picked her up and rocked her to sleep. Leibhart then laid Emily on the couch in the living room and went into the kitchen to do some cooking. After approximately 15 minutes, Leibhart returned to the living room to check on the children. She saw that Emily was lying face down on the floor beside the couch. When Leibhart picked her up, Emily was gasping for air. Leibhart took Emily to Waller's house across the street to get help. Waller offered to call the 911 emergency dispatch service, so Leibhart returned with Emily to her porch and waited there with her until emergency personnel arrived and took Emily to the hospital.

During direct examination, Leibhart's counsel elicited testimony that when Leibhart was interrogated by the police on November 13, 2000, she did not tell them that her son had hit Emily on the head with the telephone. Leibhart testified that she did not think of the telephone incident at the time and was thinking only of events that occurred immediately before she realized that Emily seemed tired. At trial, Leibhart denied that she had shaken Emily.

On April 19, 2002, the jury found Leibhart guilty of first degree assault. On May 23, the district court sentenced Leibhart to 1 to 3 years' imprisonment. Leibhart appeals her conviction.

## ASSIGNMENTS OF ERROR

Leibhart asserts that (1) the district court erred in allowing Shaffer and Moran to testify regarding shaken baby syndrome and overruling her motion in limine to exclude such testimony on the basis that it lacked sufficient reliability under the standards of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993); (2) the evidence was insufficient to sustain a conviction for first degree assault because (a) there was not sufficient evidence to sustain a finding that Leibhart inflicted the injury on Emily and (b) there was not sufficient evidence to sustain a finding that the injury was inflicted "intentionally or knowingly"; and (3) trial counsel provided ineffective assistance by (a) failing to obtain a ruling on her motion in limine prior to Shaffer's testimony, (b) eliciting testimony regarding her failure to tell police on November 13, 2000, that her son had hit Emily on the head with a telephone, then commenting on such silence during closing arguments, and failing to object to the State's cross-examination regarding her silence, (c) failing to call an expert to refute the State's expert testimony regarding shaken baby syndrome both during the hearing and at trial, and (d) failing to cross-examine the State's expert regarding the existence of medical evidence that Emily suffered a blow to her head.

## STANDARDS OF REVIEW

A trial court's ruling in receiving or excluding an expert's testimony which is otherwise relevant will be reversed only when there has been an abuse of discretion. *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001). See, also, *General Electric Co. v. Joiner*, 522 U.S. 136, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997) (abuse of discretion is proper standard of review of district court's evidentiary ruling on admission of expert testimony under *Daubert*). A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrain from acting, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Schafersman, supra.*

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue

is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Segura*, 265 Neb. 903, 660 N.W.2d 512 (2003).

## ANALYSIS

*Expert Testimony.*

Leibhart first asserts that the district court erred in admitting the expert testimony of Shaffer and Moran regarding shaken baby syndrome and in overruling her motion in limine to exclude such testimony on the basis that it lacked sufficient reliability. We conclude that the district court did not abuse its discretion in ruling to admit expert testimony regarding shaken baby syndrome.

In *Schafersman*, 262 Neb. at 232, 631 N.W.2d at 876, we directed

> for trials commencing on or after October 1, 2001, that in trial proceedings, the admissibility of expert opinion testimony under the Nebraska rules of evidence should be determined based upon the standards first set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

We note that although *Schafersman* was a civil case, Neb. Evid. R. 702 applies to both civil and criminal cases, and that therefore our holding in *Schafersman* applies to the admission of expert testimony in both civil and criminal cases. The trial in the instant case commenced on April 17, 2002, and therefore the admissibility of expert opinion testimony in this case, once sufficiently called into question by Leibhart, was to be determined based on the *Daubert* standards adopted by this court in *Schafersman*.

We noted in *Schafersman* that in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999), the U.S. Supreme Court determined that the *Daubert* standards were to apply not only to "scientific" knowledge, but to all types of expert testimony. *Schafersman v. Agland Coop*, 262 Neb.

215, 631 N.W.2d 862 (2001). In the present case, Leibhart challenged the testimony of doctors regarding the theory of shaken baby syndrome. Such testimony was expert testimony, and its admissibility was governed by the *Daubert* standards.

■ In *Schafersman*, we described how *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), was to be applied to inquiries regarding the admission of expert opinion testimony. We stated that

> in those limited situations in which a court is faced with a decision regarding the admissibility of expert opinion evidence, the trial judge must determine at the outset, pursuant to Neb. Evid. R. 702, whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment whether the reasoning or methodology underlying the testimony is valid and whether that reasoning or methodology properly can be applied to the facts in issue.

*Schafersman*, 262 Neb. at 232, 631 N.W.2d at 876-77. We noted that "once the validity of the expert's reasoning or methodology has been satisfactorily established, any remaining questions regarding the manner in which that methodology was *applied* in a particular case will generally go to the weight of such evidence." *Id.* at 232, 631 N.W.2d at 877. We stated in *Schafersman* that *Daubert* "does not require that courts reinvent the wheel each time that evidence is adduced, but it does permit the reexamination of certain types of evidence where recent developments raise doubts about the validity of previously relied-upon theories or techniques." *Schafersman*, 262 Neb. at 228, 631 N.W.2d at 874.

> "The essential requirement of *Daubert* and its progeny is that to avoid exclusion, experts must offer the courts more than unsupported assertions; they must offer evidence about the basis of their asserted expertise sufficient to enable a judge to conclude that their expert testimony will provide dependable information to the factfinder."

*Schafersman*, 262 Neb. at 229, 631 N.W.2d at 875.

We described the *Daubert* inquiry as follows:

> In evaluating expert opinion testimony under *Daubert*, where such testimony's factual basis, data, principles,

methods, or their application are called sufficiently into question, the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline. . . . In determining the admissibility of an expert's testimony, a trial judge may consider several more specific factors that *Daubert* said might "bear on" a judge's gatekeeping determination. . . . These factors include whether a theory or technique can be (and has been) tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether there are standards controlling the technique's operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community. . . . These factors are, however, neither exclusive nor binding; different factors may prove more significant in different cases, and additional factors may prove relevant under particular circumstances.

(Citations omitted.) *Schafersman v. Agland Coop*, 262 Neb. 215, 233, 631 N.W.2d 862, 877 (2001).

At the *Daubert* hearing in the present case, Moran testified regarding his qualifications as a pediatrician and, in particular, his training with respect to shaken baby syndrome. He testified that clinical studies had been conducted to study shaken baby syndrome, that such studies had been subject to peer review and publication, that the diagnostic error rate in such studies had been small, and that shaken baby syndrome was a scientifically recognized medical diagnosis within the pediatric community. Leibhart cross-examined Moran regarding studies conducted by certain clinicians who theorized that mere shaking is insufficient to generate the forces necessary to cause the injuries associated with shaken baby syndrome and that blunt trauma was also required to produce such injuries. Moran testified that such clinicians had determined that their competing theory required more study. Neither the State nor Leibhart presented evidence other than Moran's testimony at the hearing.

At the conclusion of the *Daubert* hearing, the district court found that shaken baby syndrome had been "peer reviewed, it ha[d] been clinically tested as the best it can and it has [a] small

error rate"; that there was "considerable literature put out by professional scientific organizations that substantiate the findings"; and that "it is generally accepted within the scientific medical community of pediatrics." The court determined that expert testimony concerning shaken baby syndrome was scientifically reliable. The court found that the expert testimony that the State sought to admit would assist the jury in understanding the evidence and in determining specific issues that arose within the case. The court therefore ruled that such testimony would be received.

We note that the evidence presented at the *Daubert* hearing in this case was not extensive and consisted mainly of Moran's testimony and his reference to the relevant literature. However, the level of inquiry in a *Daubert* hearing may vary depending on the nature of the expert testimony challenged, and the inquiry in the present case was appropriate and sufficient. As we stated in *Schafersman*, *Daubert* "does not require that courts reinvent the wheel each time that evidence is adduced." 262 Neb. at 228, 631 N.W.2d at 874. In this respect, we note that expert testimony regarding shaken baby syndrome has been previously admitted by courts in this state. See, *State v. Reynolds*, 240 Neb. 623, 483 N.W.2d 155 (1992); *State v. Wojcik*, 238 Neb. 863, 472 N.W.2d 732 (1991). See, also, *Farm Bureau Ins. Co. v. Witte*, 256 Neb. 919, 594 N.W.2d 574 (1999). We also note that for some time, courts in other states have found shaken baby syndrome to be a generally accepted diagnosis in the medical community. *State v. Lopez*, 306 S.C. 362, 412 S.E.2d 390 (1991); *State v. McClary*, 207 Conn. 233, 541 A.2d 96 (1988); *Matter of Lou R.*, 131 Misc. 2d 138, 499 N.Y.S.2d 846 (1986). General acceptance is one of several factors that may be considered to determine the reliability of expert testimony. In this regard, we note that a reexamination under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), is most appropriate "where recent developments raise doubts about the validity of previously relied-upon theories or techniques." *Schafersman*, 262 Neb. at 228, 631 N.W.2d at 874. In the present case, although Leibhart cross-examined Moran regarding studies which might have raised doubts about accepted theories of shaken baby syndrome, Moran's testimony indicated that such studies needed

further testing and that the prevailing literature adhered to previously relied-upon theories regarding shaken baby syndrome.

In accordance with the *Daubert* standards as prescribed by this court in *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), we conclude that the district court did not abuse its discretion in ruling to admit expert testimony regarding shaken baby syndrome. With respect to general causation, the district court did not abuse its discretion in concluding on this record that the reasoning or methodology underlying testimony regarding shaken baby syndrome was valid, and with respect to specific causation, the district court did not abuse its discretion in concluding that such reasoning or methodology properly could be applied to the facts in issue in this case. Based on the evidence presented at the hearing, the court concluded that testimony regarding shaken baby syndrome in general was sufficiently reliable under the *Daubert* standards because the theory had been clinically tested and peer reviewed, the findings had been substantiated as documented by considerable literature, the studies showed a low error rate, and the findings were generally accepted within the field of pediatrics. In addition, testimony regarding the specific injuries related to shaken baby syndrome indicated that such expert testimony could be applied to the facts in issue in this case because such injuries were similar to the injury sustained by Emily and causes other than shaken baby syndrome could be excluded. We therefore conclude that Leibhart's assignments of error with regard to such expert testimony are without merit.

## Sufficiency of Evidence.

Leibhart next asserts that the evidence presented by the State in this case was insufficient to support her conviction for first degree assault, a Class III felony under Neb. Rev. Stat. § 28-308(2) (Reissue 1995). Section 28-308(1) provides that one commits first degree assault if he or she "intentionally or knowingly causes serious bodily injury to another person." Leibhart argues that the evidence in the present case was insufficient in two respects: (1) there was not sufficient evidence to sustain a finding that Leibhart was the person who inflicted the injury on Emily and (2) there was not sufficient evidence to sustain a finding that the injury was "intentionally or knowingly" inflicted on Emily.

When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Miner*, 265 Neb. 778, 659 N.W.2d 331 (2003). Circumstantial evidence is not inherently less probative than direct evidence. *Id.* In finding a defendant guilty beyond a reasonable doubt, a jury may rely upon circumstantial evidence and the inferences that may be drawn therefrom. *Id.*

Although there was no direct evidence that Leibhart was the person who inflicted the injury on Emily, there was sufficient circumstantial evidence that the jury could have relied on to find that Leibhart committed the assault. The testimony of witnesses, including Leibhart, established that from shortly before 10 a.m. until shortly before 11 a.m. on November 10, 2000, Leibhart was the only adult in Emily's presence. Testimony of Leibhart's husband and other witnesses established that the symptoms of a severe injury to Emily had not manifested themselves prior to the time Leibhart's husband left the house with the couple's son shortly before 10 a.m. Testimony of Leibhart and others established that shortly before 11 a.m., Leibhart went to Waller's house in an attempt to get emergency help for Emily. Shaffer testified that the injury inflicted on Emily was such that the symptoms would have manifested themselves "within a few minutes" after the injury was inflicted. Moran testified that because of the severity of Emily's injury, she would have begun to manifest symptoms within a few minutes or less after the injury was inflicted and that she would not have been expected to be lucid for more than a couple of minutes after sustaining the injury. Moran further testified that Emily's injury could not have been caused by a bump on the head or a fall from the couch and that the shaking that resulted in her injury could not have been done by another child.

There was therefore evidence in this case from which the jury could reasonably find that the injury inflicted on Emily was caused by her being shaken by an adult and that during the time the injury was inflicted, Leibhart was the only adult in Emily's presence. From these findings, the jury could reasonably infer that Leibhart shook Emily, thereby inflicting injury on her.

With regard to Leibhart's argument that there was not sufficient evidence that the injury was "intentionally or knowingly" inflicted on Emily, we note that first degree assault is a general, and not specific, intent crime, and thus the intent required under § 28-308(1) relates to the assault, not to the injury which results. *State v. Williams*, 243 Neb. 959, 503 N.W.2d 561 (1993). When one deliberately does an act which proximately causes and directly produces a result which the criminal law is designed to prevent, the actor is legally and criminally responsible for all the natural or necessary consequences of the unlawful act, although a particular result of the act was not intended or desired. *State v. Hoffman*, 227 Neb. 131, 416 N.W.2d 231 (1987). Therefore, the required intent in the present case was an intent to shake Emily, not necessarily an intent to cause the specific brain injury that resulted from her shaking.

When the sufficiency of evidence as to criminal intent is questioned, we have stated that the intent with which an act is committed is a mental process and may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident. *State v. Leonor*, 263 Neb. 86, 638 N.W.2d 798 (2002). As discussed above, there was evidence from which the jury could find that Leibhart shook Emily. There was also evidence from which the jury could find that Emily's injury constituted "serious bodily injury" which is defined as "bodily injury which involves a substantial risk of death, or which involves substantial risk of serious permanent disfigurement, or protracted loss or impairment of the function of any part or organ of the body." See Neb. Rev. Stat. § 28-109(20) (Reissue 1995). Shaffer testified that Emily suffered a permanent disability as the result of the incident and that she would never completely recover from her injury. Moran also testified that Emily sustained permanent injury or impairment and that without immediate medical intervention, she would have died.

Moran testified that shaken baby syndrome involves "nonaccidental traumatic brain injury" and that Emily's injury was the result of shaken baby syndrome. He indicated that the cause of Emily's injury was being shaken by an adult. Shaffer testified that Emily's injury was the result of shaken baby syndrome, which he described as "something that was a violent episode"

which involved her being shaken with her "head flopping around and back and forth."

The evidence in this case, viewed in the light most favorable to the State, is sufficient to support Leibhart's conviction. See *State v. Miner*, 265 Neb. 778, 659 N.W.2d 331 (2003). The testimony of witnesses was such that the jury could reasonably find that Leibhart was the sole adult in Emily's presence at the time Emily sustained her injury. Expert testimony supported a finding that Emily's injury was caused by her being shaken by an adult and that her injury could not be explained by another cause such as being hit or bumped on the head or falling off the couch. Expert testimony also supported a finding that Emily's injury was the result of a nonaccidental event. Viewing such evidence most favorably to the State, the jury could reasonably have found that Leibhart had shaken Emily and that she had done so intentionally and knowingly. We therefore reject Leibhart's assignments of error regarding sufficiency of the evidence.

*Ineffective Assistance of Counsel.*

In this direct appeal, Leibhart claims that her trial counsel provided ineffective assistance in certain respects. A claim of ineffective assistance of counsel need not be dismissed merely because it is made on direct appeal. *State v. Faust*, 265 Neb. 845, 660 N.W.2d 844 (2003). The determining factor is whether the record is sufficient to adequately review the question. *Id.* If the matter has not been raised or ruled on at the trial level and requires an evidentiary hearing, an appellate court will not address the matter on direct appeal. *Id.*

To establish a right to relief because of a claim of ineffective counsel at trial or on direct appeal, the defendant has the burden first to show that counsel's performance was deficient; that is, counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law in the area. The defendant must also show that counsel's deficient performance prejudiced the defense in his or her case. *Id.* To prove prejudice, the defendant must show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* When a defendant challenges a conviction, the question is whether there is a reasonable probability that absent the errors, the fact finder would have had a reasonable doubt concerning guilt. *Id.*

Leibhart asserts that her trial counsel provided ineffective assistance in four respects. Her first argument is that trial counsel provided ineffective assistance by failing to obtain a ruling on her motion in limine challenging the admissibility of evidence regarding shaken baby syndrome prior to Shaffer's testimony. Because we have concluded that the trial court did not err in subsequently denying Leibhart's motion in limine and by admitting expert testimony regarding shaken baby syndrome, we conclude that Leibhart suffered no prejudice as a result of trial counsel's failure to obtain a ruling on the motion prior to Shaffer's testimony. Such testimony would have been properly admitted even if trial counsel had insisted on a ruling.

Leibhart also argues that trial counsel was ineffective in the following respects: eliciting testimony regarding her failure to tell police on November 13, 2000, that her son had hit Emily on the head with a telephone, commenting on such silence during closing arguments, and failing to object to the State's cross-examination regarding her silence; failing to call an expert to refute the State's expert testimony regarding shaken baby syndrome; and failing to cross-examine the State's expert regarding the existence of medical evidence that Emily suffered a blow to her head. A proper review of each of these assertions requires an evaluation of trial strategy. The second argument requires a showing that trial counsel could have called an expert to refute the State's expert testimony, and the third argument requires a showing of medical evidence that Emily suffered a blow to her head. Each of these arguments requires an evaluation of matters outside the record before us on direct appeal. We therefore conclude that the record on direct appeal is not sufficient to adequately review these arguments, and because these matters have not been raised or ruled on at the trial level and may require an evidentiary hearing, we will not address these matters on direct appeal. See *State v. Faust*, 265 Neb. 845, 660 N.W.2d 844 (2003).

150

## CONCLUSION

We conclude that the district court did not abuse its discretion in ruling to admit expert testimony regarding shaken baby syndrome under the *Daubert* standards prescribed by this court in *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001). We further conclude that the evidence in this case was sufficient to support Leibhart's conviction. Finally, we reject Leibhart's claims that her trial counsel provided ineffective assistance because each claim was either without merit or could not be adequately reviewed on the record before us in this direct appeal. We therefore affirm Leibhart's conviction and sentence for first degree assault.

AFFIRMED.