Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/07/2016 12:11 PM CDT

State of Nebraska, appellee, v.
Cody Olbricht, also known as
Cody Olbrich, appellant.

___ N.W.2d ___

Filed February 9, 2016.    No. A-15-404.

1.  **Evidence: Appeal and Error.** In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.

2.  ____: ____. The relevant question when an appellate court reviews a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

3.  **Criminal Law: Judgments: Appeal and Error.** While in a bench trial of a criminal case the court's findings have the effect of a verdict and will not be set aside unless clearly erroneous, an appellate court has an obligation to reach an independent, correct conclusion regarding questions of law.

4.  **Criminal Law: Minors: Words and Phrases.** For the purposes of Neb. Rev. Stat. § 28-707(7) (Cum. Supp. 2014), the statute criminalizing knowing and intentional child abuse resulting in serious bodily injury, serious bodily injury is defined as bodily injury which involves a substantial risk of death, or which involves substantial risk of serious permanent disfigurement, or protracted loss or impairment of the function of any part or organ of the body.

5.  **Criminal Law: Minors: Convictions: Appeal and Error.** Child abuse convictions will be upheld where the evidence establishes that the defendant was the sole caregiver for the victim at the time the abuse occurred.

6. **Double Jeopardy: Evidence: Appeal and Error.** The Double Jeopardy
   Clause precludes a second trial once the reviewing court has found the
   evidence legally insufficient.

Appeal from the District Court for Scotts Bluff County: RANDALL L. LIPPSTREU, Judge. Reversed and vacated.

Leonard G. Tabor for appellant.

Douglas J. Peterson, Attorney General, and George R. Love for appellee.

MOORE, Chief Judge, and IRWIN and INBODY, Judges.

IRWIN, Judge.

## I. INTRODUCTION

Cody Olbricht, also known as Cody Olbrich, appeals his conviction and sentence for knowing and intentional child abuse resulting in serious bodily injury. On appeal, Olbricht argues that there was insufficient evidence to support his conviction, the trial court erred in overruling his motions for directed verdict and new trial, the trial court erred in making numerous evidentiary rulings, and Olbricht received an excessive sentence. Upon our review, we find that there was insufficient evidence to support Olbricht's conviction. Accordingly, we reverse Olbricht's conviction and vacate his sentence.

## II. BACKGROUND

On September 28, 2014, a 3-year-old child, A.M., was admitted to an emergency room in Scottsbluff, Nebraska. A.M. had bruising on her face, torso, arms, and legs. Doctors also observed that A.M. was not interactive, appeared sleepy, and had bleeding in the white part of her left eye. Due to A.M.'s symptoms, doctors suspected she might be suffering from a "subdural hemorrhage" (brain bleed). A CAT scan revealed a brain bleed and infarct in A.M.'s brain. Further examination revealed that A.M. also had a laceration on the

left lobe of her liver. Due to the severity of her brain injury, she was transferred by helicopter to a hospital in Denver, Colorado, for treatment.

A.M. had been transported to the emergency room by her maternal grandmother, Lynelle Pahl. Cassandra Miller, who is A.M.'s mother, and Olbricht, who is Miller's boyfriend, also came to the emergency room shortly after A.M. was admitted. Olbricht is not A.M.'s biological father, but Olbricht, Miller, and A.M. lived together, along with the couple's son.

Olbricht and Miller informed the doctors at the emergency room that A.M. had not been feeling well for the past week. They explained that A.M. was less active, had a headache, and had vomited throughout the week. Olbricht and Miller also expressed their belief that A.M. might have a bleeding disorder that caused her bruises. Laboratory tests revealed that she did not suffer from a bleeding disorder that would have caused her bruising or the brain bleed.

The emergency room doctor suspected that A.M. may have been abused and notified the authorities. Olbricht was subsequently charged with knowing and intentional child abuse resulting in serious bodily injury to A.M. See Neb. Rev. Stat. § 28-707(1) and (7) (Cum. Supp. 2014).

The matter proceeded to a bench trial held on March 20, 23, and 24, 2015. The State subpoenaed Miller to testify. Miller testified that she and Olbricht had been "boyfriend and girl-friend" for 2½ years. According to Miller, A.M. referred to Olbricht as "daddy."

Miller testified that A.M. had previously received various injuries while in Olbricht's care. First, Miller testified that in March 2014, A.M. cut her bottom lip while Olbricht was watching her. In another incident that Miller said she believed occurred in September 2014, A.M. received burns to her lip and face while under Olbricht's supervision. With regard to the burning incident, Miller testified that A.M. was in the shower when Miller got home and that A.M.'s face was red. Miller next testified that A.M. suffered bruises to her right hip in

September 2014. During that incident, A.M. was home with Olbricht while Miller was at work. Olbricht told Miller that A.M. had fallen playing on rocks in the backyard. Next, Miller testified that she was at work on September 20 while Olbricht cared for A.M. When Miller returned home, she noticed the white of A.M.'s left eye was red.

Miller also testified regarding the events of the day before A.M. was admitted to the emergency room, September 27, 2014. Miller testified that she worked outside the home from approximately 10 a.m. to 3:40 p.m. while Olbricht watched A.M., the couple's son, and Olbricht's two other children. According to Miller, A.M. received a bruise to her cheek just after Miller got off work while A.M. was playing with the other children. Miller testified that she and Olbricht were in another room when one of Olbricht's children yelled that another child had hit A.M.

Miller testified that Olbricht took his other children back to their mother's care at some point after Miller returned home from work. Miller testified that she and Olbricht then took A.M. to a fast-food restaurant "to get something to eat" and drove her to a babysitter in Lyman, Nebraska. Miller testified that just as they arrived at the gas station in Lyman to drop A.M. off with the babysitter, A.M. vomited. According to the babysitter, Miller changed A.M.'s clothes and then she and Olbricht left A.M. with the babysitter for the night.

The babysitter testified that she knew Olbricht and Miller because she worked with Pahl, Miller's mother. The babysitter testified that when she met Olbricht and Miller to pick up A.M. on September 27, 2014, A.M. had just vomited on herself. According to the babysitter, Olbricht was upset with A.M. for vomiting and was telling her to stop. The babysitter noticed that A.M. had marks on her face, neck, and back. The babysitter testified that she took a picture of A.M.'s bruises and sent them to Pahl. According to the babysitter, A.M. was lethargic and vomited numerous times that night. The babysitter also testified over objection that when she informed

A.M. her grandmother, Pahl, was going to pick her up, A.M. seemed scared to go home:

> She seemed terrified and she didn't want to go home. She kept expressing to me she didn't want to go home.
>
> . . . .
>
> . . . And then when I asked her if somebody was hurting her at home and she explained to me that, yes, and I said who and she said, "daddy." And I said, "where does daddy hurt you?" She pointed to her shin and she pointed to her foot. And I had rubbed her head and I felt lumps all along her head and I said, "did he hit your head, too," and she said yes.

The State did not ask the babysitter if A.M. had indicated a timeframe for when she was hurt or hit by Olbricht.

Pahl testified that she was at work when the babysitter texted her the photograph of A.M.'s bruises around 8 p.m. on September 27, 2014. Pahl spoke with the babysitter by telephone and decided that Pahl would pick up A.M. in the morning. Pahl testified that when she picked A.M. up on September 28, A.M. was frail, lethargic, and could not hold her head up. Pahl transported A.M. to the emergency room and notified Olbricht and Miller.

Pahl testified that she had seen A.M. twice during the week leading up to A.M.'s hospitalization. On Monday, September 22, 2014, Pahl watched A.M. alone at her house for approximately an hour. On either September 24 or 25, Olbricht and Miller brought A.M. to visit Pahl at work. It is not entirely clear from the record, but it appears that Pahl was not alone with A.M. during the work visit.

The emergency room doctor who had treated A.M., Jeffrey Salisbury, also testified at the trial. Dr. Salisbury opined that the subdural hemorrhage and infarct in A.M.'s brain were injuries that presented a substantial risk of death. Dr. Salisbury also testified that "a significant liver laceration that is bleeding [is] the most life threatening" because the liver, unlike some other organs, cannot be removed. According to Dr. Salisbury,

there was no way to tell exactly how old A.M.'s brain injury was at the time she came to the emergency room. Dr. Salisbury opined that the brain injury was "acute," meaning it could have been anywhere from 5 minutes to 2 weeks old.

The State also presented the testimony of Dr. Andrew Sirotnak, a forensic pediatrician and a member of the medical team that treated A.M. at the hospital in Denver. Dr. Sirotnak testified that he had diagnosed A.M. as a "battered child," meaning "a child that's been injured in a multi system manner over time." According to Dr. Sirotnak, A.M.'s injuries were likely nonaccidental because some occurred over soft tissue and others displayed a bruising pattern that indicated they were inflicted with an object. With respect to the injuries on A.M.'s legs and hip, Dr. Sirotnak opined that she had been hit with a wire hanger because the bruises were triangular in shape.

Dr. Sirotnak testified that A.M.'s brain injury posed a substantial risk of death because untreated brain injury can "progress[] to seizures and . . . lead to brain dysfunction, [and] respiratory or cardiac arrest as well." With respect to A.M.'s lacerated liver, Dr. Sirotnak testified, "[T]he liver injury in isolation, the way it was graded or seen on CT, I believe it was a laceration, and it was handled nonoperatively, there's also a risk that these things can bleed and, of course, recurrent trauma concerns that can bleed."

With respect to what caused A.M.'s injuries, Dr. Sirotnak testified that her liver laceration was likely caused by blunt trauma akin to the amount of force seen in a car accident. Dr. Sirotnak gave his opinion that based on A.M.'s medical history, there was no accidental explanation for her liver injury. Dr. Sirotnak testified that A.M.'s brain injury was "clearly something that was inflicted" and that the injury was likely the result of being "thrown from something or thrown by something."

On cross-examination, Dr. Sirotnak testified that the timing of A.M.'s injuries "would vary depending on the type

of mechanism that caused it." Dr. Sirotnak testified that he believed A.M.'s brain injury occurred "within . . . a day or two" or within a "few days" of her hospitalization. Dr. Sirotnak testified that he could not tell when the liver injury occurred.

At the close of the State's case, Olbricht moved for a directed verdict, arguing "the State failed to present a prima fa[cie] case." The court overruled the motion for directed verdict.

Olbricht then proceeded to present his defense. Olbricht called numerous family members and acquaintances who testified that A.M. was always healthy, happy, and clean and that Olbricht had never abused her. Olbricht also called Miller to the stand. Miller testified that, in addition to the prior incidents in which A.M. was injured while in Olbricht's care, A.M. had also suffered injuries in Miller's care. Miller testified that in August or September 2014, both she and Olbricht were home when A.M. fell down the stairs. Miller also testified that on September 16, she was with A.M. at the park when A.M. got hit in the head by a swing.

Lastly, Olbricht took the stand in his own defense. Olbricht provided explanations for A.M.'s previous injuries. According to Olbricht, A.M. received the bruise on her right hip while playing on bricks behind the family's apartment on September 20, 2014. With respect to the bruises on A.M.'s leg, Olbricht testified that she had been bumped in the leg by the children's motorized toy car. Olbricht testified that he had not seen the bruises on A.M.'s ribs before she was hospitalized. According to Olbricht, the white of A.M.'s left eye became red after she had been playing with the couple's son. With respect to A.M.'s cut lip, Olbricht testified that he had been bathing A.M. and left to get a towel. A.M.'s lip was bleeding when Olbricht returned to the bathroom, leading Olbricht to believe she had slipped and cut her lip on the shower railing. With respect to the burns A.M. had suffered to her face and mouth, Olbricht testified that he had left her in the shower to change

the diaper of the couple's son and that she had turned the water to hot. Lastly, Olbricht testified regarding the incident in which A.M. received a bruise on her cheek after Miller had returned home from work on September 27, 2014. Olbricht testified that one of his children had hit A.M. with either his hand or a toy while he and Miller were in another room. Olbricht denied abusing A.M.

The court found Olbricht guilty of knowing and intentional child abuse resulting in serious bodily injury and issued a written verdict. In the written verdict, the court found that both A.M.'s brain bleed and her lacerated liver created a substantial risk of death. The court noted that neither Olbricht nor Miller could provide an explanation for A.M.'s injuries. The court also referenced Dr. Sirotnak's diagnosis of A.M. as a battered child based on her many injuries, her bruises in various stages of healing, and the pattern of her bruises. The court stated that "[t]he majority, if not all, of [A.M.'s] documented injuries occurred when she was in the sole physical care of . . . Olbricht." Lastly, the court noted the evidence that A.M. was scared of Olbricht and had told the babysitter that Olbricht had hurt her. Based on this evidence, the court found Olbricht guilty of child abuse.

After the verdict, Olbricht moved for a new trial, arguing that "the evidence was just too weak by the State." The court overruled Olbricht's motion for new trial.

At the sentencing hearing, the court pronounced Olbricht's sentence to be 15 to 30 years' imprisonment, although the written journal entry and judge's notes for the sentencing reflect a sentence of 18 to 30 years' imprisonment. Olbricht appeals from his sentence and conviction.

## III. ASSIGNMENTS OF ERROR

Olbricht assigns five errors: (1) The evidence was insufficient to support his conviction for child abuse, (2) the trial court erred when it overruled Olbricht's motion for directed verdict at the close of the State's case, (3) the trial court erred

in admitting six items of evidence over Olbricht's objections, (4) the trial court erred in overruling Olbricht's motion for new trial, and (5) Olbricht received an excessive sentence.

## IV. ANALYSIS

Olbricht first argues that there was insufficient evidence adduced at the trial to sustain his conviction for knowing and intentional child abuse resulting in serious bodily injury. We agree that there was insufficient evidence to prove that Olbricht was the person who caused A.M.'s brain bleed or lacerated liver. We conclude this because the evidence presented never showed, directly or circumstantially, that A.M.'s serious bodily injuries occurred during a discrete timeframe when Olbricht was the only adult in her presence.

[1,2] In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Hale*, 290 Neb. 70, 858 N.W.2d 543 (2015). The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*; *State v. McClain*, 285 Neb. 537, 827 N.W.2d 814 (2013).

[3] While in a bench trial of a criminal case the court's findings have the effect of a verdict and will not be set aside unless clearly erroneous, an appellate court has an obligation to reach an independent, correct conclusion regarding questions of law. *State v. Keup*, 265 Neb. 96, 655 N.W.2d 25 (2003).

[4] Olbricht was charged with knowingly and intentionally committing child abuse resulting in serious bodily injury. See § 28-707(7). "Serious bodily injury" is defined as "bodily injury which involves a substantial risk of death, or which involves substantial risk of serious permanent disfigurement, or protracted loss or impairment of the function of

any part or organ of the body." Neb. Rev. Stat. § 28-109(20) (Reissue 2008).

[5] Nebraska courts have upheld child abuse convictions where the evidence established that the defendant was the sole caregiver for the victim at the time the abuse occurred. For example, in *State v. Robinson*, 278 Neb. 212, 769 N.W.2d 366 (2009), the Nebraska Supreme Court determined that there was sufficient evidence to sustain the defendant's conviction for knowing or intentional child abuse resulting in death. The child had died of trauma to the head and abdomen, which a doctor labeled as nonaccidental. *Id.* A pediatric physician testified that the child would have been unconscious within 15 to 20 minutes after sustaining the injuries. *Id.* The child's mother testified that she left the victim with the defendant for the entire afternoon and that the child was already unconscious and cold when she picked her up. *Id.* The court stated, "[E]vidence that [the child] was in [the defendant's] sole care during the time she suffered injuries was circumstantial evidence from which the jury could have inferred that he caused the injuries." *Id.* at 222, 769 N.W.2d at 373-74.

Similarly, in *State v. Chavez*, 281 Neb. 99, 793 N.W.2d 347 (2011), the court upheld the defendant's conviction for intentional child abuse resulting in death. The doctor who performed the autopsy opined that the cause of death was blunt force head injury consistent with shaking and that the injury occurred within a couple hours of the child's being found not breathing. *Id.* The child's mother testified that she left the child alone with the defendant from 5:45 to 7:30 a.m. and discovered the child was not breathing about a half an hour later. *Id.* The court concluded that "[t]he evidence . . . established that [the child's] death was the result of shaken baby syndrome and that [the defendant], *as sole caregiver*, had shaken her during the relevant timeframe." *Id.* at 110, 793 N.W.2d at 356 (emphasis supplied).

In *State v. Leibhart*, 266 Neb. 133, 662 N.W.2d 618 (2003), the defendant was convicted of first degree assault for injuring

an 18-month-old child in her care. The child had been dropped off at the defendant's home daycare at 7:50 a.m. *Id.* The defendant's husband left the home around 10 a.m. *Id.* At 10:55 a.m., the defendant summoned her neighbor for help because the child was in distress. *Id.* A doctor testified that the child had suffered a brain injury indicative of shaking. *Id.* The doctor opined that the symptoms would have manifested themselves within minutes. *Id.* The court upheld the defendant's conviction, stating, "The testimony of witnesses was such that the jury could reasonably find that [the defendant] was the sole adult in [the child's] presence at the time [the child] sustained her injury." *Id.* at 148, 662 N.W.2d at 630. See, also, *State v. Kuehn*, 273 Neb. 219, 236, 728 N.W.2d 589, 604 (2007) (upholding defendant's conviction for negligent child abuse because "[the child] was injured while he was in [the defendant's] care"); *State v. Jim*, 13 Neb. App. 112, 688 N.W.2d 895 (2004) (affirming trial court's denial of defendant's motion to dismiss or for directed verdict in case of child abuse resulting in death where evidence demonstrated that defendant was alone with child from 4:35 to 11:30 p.m. and child's body was found stiff in his bed the next morning, indicating he had been dead for number of hours); *State v. Fitzgerald*, 1 Neb. App. 315, 493 N.W.2d 357 (1992) (finding sufficient evidence supported defendant's conviction for intentional child abuse where evidence demonstrated that defendant was alone with child all morning and child had been intentionally burned by hot water sometime in late morning).

In contrast, there was no evidence adduced at trial indicating a definite period of time when A.M.'s abuse must have occurred and during which Olbricht was her sole caregiver. Dr. Salisbury testified that A.M.'s brain injury presented a substantial risk of death. Dr. Salisbury also opined that a liver laceration was "life threatening" because the liver, unlike other organs, cannot be removed. Similarly, Dr. Sirotnak testified that A.M.'s brain injury could have led to seizures, brain dysfunction, and respiratory or cardiac arrest. With respect to

A.M.'s liver injury, Dr. Sirotnak opined that there was a risk of bleeding and recurrent trauma. Viewed in the light most favorable to the State, the doctors' testimony supports a finding that either A.M.'s brain injury or her liver injury were serious bodily injuries within the meaning of § 28-109(20). There was no testimony that A.M.'s other injuries—the bruises on her cheek, legs, hip, torso, or back; the cut on her lip; or the burns to her face—involved a substantial risk of death. Therefore, none of these other injuries could be the basis for convicting Olbricht of knowing and intentional child abuse resulting in serious bodily injury.

According to the evidence at trial, the timeframe in which A.M.'s serious bodily injuries were inflicted was broad. Specifically, Dr. Salisbury testified that A.M.'s brain injury was "acute," meaning it could have occurred anywhere from 5 minutes to 2 weeks before she came to the emergency room. Dr. Sirotnak testified that A.M.'s brain injury occurred within "a day or two" of her hospitalization. Neither doctor provided a specific timeframe in which the liver injury occurred.

A.M. was not in Olbricht's sole care for the week or the "day or two" before she was hospitalized. For example, Miller was with both Olbricht and A.M. during the afternoon and evening of September 27, 2014, the day before A.M. was hospitalized. Additionally, A.M. was alone with Pahl for approximately an hour 6 days before her hospitalization. Furthermore, the night before her hospitalization, A.M. was in the care of the babysitter and neither Olbricht nor Miller was present. Therefore, pursuant to Dr. Sirotnak's opinion that the injury occurred within "a day or two" of A.M.'s hospitalization, Olbricht, Miller, and the babysitter cared for A.M. during the relevant timeframe. Pursuant to Dr. Salisbury's opinion that A.M.'s brain injury was between 5 minutes and 2 weeks old, Olbricht, Miller, the babysitter, and Pahl all cared for A.M. during the relevant timeframe. With respect to A.M.'s liver injury, neither doctor provided a timeframe during which the injury was inflicted, thereby making it impossible to establish

that Olbricht was A.M.'s sole caregiver when the liver lacera-
tion occurred. The North Carolina Supreme Court articulated
the rule well when it stated, "Where an adult has *exclusive
custody* of a child for a period of time and during such time
the child suffers injuries which are neither self-inflicted nor
accidental, the evidence is sufficient to create an inference
that the adult inflicted an injury." *State v. Perdue*, 320 N.C.
51, 63, 357 S.E.2d 345, 353 (1987) (emphasis supplied).
Here, the lack of evidence that Olbricht had exclusive custody
of A.M. during the time when her substantial injuries were
inflicted prevents the conclusion that Olbricht committed
child abuse.

In urging us to find sufficient evidence to sustain Olbricht's
conviction, the State relies on the district court's comment
that "[t]he majority, if not all, of [A.M.'s] documented inju-
ries occurred when she was in the sole physical care of . . .
Olbricht." Brief for appellee at 12. It is true that Olbricht and
Miller testified about a number of injuries that occurred while
Olbricht was supervising A.M. However, the record does not
support a finding that Olbricht caused either of the two injuries
that could have supported his conviction: A.M.'s brain bleed
and lacerated liver. Specifically, the State failed to adduce
evidence that A.M. was in Olbricht's sole care at the time
she received the injuries that led to the brain bleed or lacer-
ated liver.

We note that there was some circumstantial evidence that
A.M. was afraid of Olbricht, that she said Olbricht hurt her,
and that she had previously suffered injuries while in Olbricht's
care. However, this evidence is insufficient to overcome the
fact that at least two other individuals could not be excluded
as having caused the brain bleed and lacerated liver that are of
significance in this case.

Viewing the evidence in the light most favorable to the
State, a rational trier of fact could not have found beyond
a reasonable doubt that Olbricht was the one who inflicted
A.M.'s serious bodily injuries. We say this because the

evidence presented never showed, directly or circumstantially, that A.M.'s serious bodily injuries occurred during a discrete timeframe when Olbricht was the only adult in her presence. Accordingly, we reverse Olbricht's conviction for knowing and intentional child abuse resulting in serious bodily injury and vacate his sentence.

[6] The Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient. *State v. Welch*, 275 Neb. 517, 747 N.W.2d 613 (2008). Because we find the evidence legally insufficient to support Olbricht's conviction, Olbricht cannot be retried.

We do not reach Olbricht's additional assignments of error because we conclude there was insufficient evidence to sustain his conviction. Similarly, because we vacate Olbricht's sentence, we need not address the discrepancy between the oral sentence pronounced at the sentencing hearing and the sentence recorded in the trial transcript.

## V. CONCLUSION

Upon our review, we find that there was insufficient evidence to support Olbricht's conviction for knowing and intentional child abuse resulting in serious bodily injury. We reverse Olbricht's conviction and vacate his sentence.

Reversed and vacated.