PERRY LUMBER COMPANY, INC., APPELLEE, V.
DURABLE SERVICES, INC., APPELLANT.
667 N.W.2d 194

Filed August 1, 2003.    No. S-02-709.

Jeffrey H. Jacobsen and William T. Wright, of Jacobsen, Orr, Nelson, Wright & Lindstrom, P.C., for appellant.

Larry W. Beucke, of Parker, Grossart, Bahensky & Beucke, for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

STEPHAN, J.

Durable Services, Inc. (Durable) appeals from an order of the district court for Phelps County overruling its motion for new trial after a jury verdict awarding damages to Perry Lumber Company, Inc. (Perry), in this civil action. Durable contends that the trial court erred in refusing to allow its expert witness to testify regarding the results of a test he conducted in the process of formulating his expert opinion.

## BACKGROUND

Perry filed this action against Durable to recover damages which resulted from a January 21, 1999, fire on Perry's premises. Perry claimed that the fire was caused by Durable's improper construction and installation of heating and air-conditioning improvements made on Perry's premises in approximately December 1992. Specifically, Perry claimed that Durable was negligent in improperly constructing and installing duct heaters in the system. Perry asserted theories of recovery based upon negligence, breach of implied warranty, and breach of contract and requested damages in the amount of approximately $1.3 million.

On the second day of trial, Perry presented the expert testimony of Samuel Wineman during its case in chief. Wineman is a mechanical engineer with 43 years' experience in the field of commercial heating, ventilating, and air-conditioning systems. Wineman testified that ductwork is insulated to absorb sound

and offer thermal insulation. The insulation can be used either inside or outside the ductwork. In his opinion, however, interior insulation is properly used only when sound reduction is required. He testified that interior duct insulation is rough and absorbent and has a tendency to capture and hold particles which make the insulation more combustible. Wineman further testified that interior duct insulation can become disconnected from the lining and blow downstream within the ductwork, where it can come into contact with a duct heater and burn. For these reasons, Wineman opined that interior duct insulation is not safe to use with electric duct heaters, even though the use is allowable under applicable codes.

Wineman testified that he had personally conducted no tests to determine whether the interior duct insulation used in the Perry installation was combustible. He noted, however, that an industry standard test known as the Steiner test is performed on insulation. This test utilizes a fireproof tunnel of approximately 2 by 2 by 25 feet, and the insulation to be tested is laid in the tunnel. Fire is then ignited at one end by a gas jet at a given temperature, and it is observed how far the flame will spread over the insulation and what pattern the flame and smoke make. Wineman testified that the industry test indicates that insulation very similar to that used in the Perry ductwork burns approximately 25 percent of the amount that red maple burns. Wineman noted that the duct insulation used in the Perry project was made of slightly different components than the current insulation manufactured by the same manufacturer, although both had the same "flame spread" rating of 25 percent. He testified that the fact that the duct insulation in the Perry project had 7 years of accumulated dust would increase its flame spread rating.

During his direct examination by Perry's counsel, Wineman was asked to describe testing conducted on duct insulation by Durable's expert, Lloyd Brown, based upon his review of Brown's deposition. Wineman stated that Brown "had the insulation in open air, and he ignited one end with a torch and put — was — and it didn't burn." Wineman testified that this test differed from the Steiner test and that it could not give an accurate indication of the flame spread of the insulation. Wineman stated his opinion that the test was not accurate and did not duplicate

the circumstances of the Perry fire because it was done outside the ductwork, there was no continual source of ignition, and there was no airflow to feed oxygen. Wineman subsequently testified that in his opinion, the Perry fire was caused when a piece of interior insulation broke loose inside the ductwork, came in contact with an electric duct heater, and began burning. He testified that the coils on the duct heater reach temperatures of approximately 900 degrees Fahrenheit.

Brown, who holds a doctorate in electrical engineering and is a licensed professional engineer with approximately 30 years' experience in fire investigation, testified as an expert witness for Durable during its case in chief on the fourth day of trial. He stated that he obtained a sample of the interior insulation used in the Perry ductwork from the manufacturer and learned that only minor changes had been made to the composition of the insulation in the last 30 years, with no change in its fire rating.

Brown testified that insulating the interior of ductwork, instead of the exterior, is more efficient and results in less heat loss. He further testified that interior lining helps to avoid accumulation of water during cooling and helps absorb sound. Brown disagreed with Wineman's opinion that it was improper to use interior duct insulation in a system with electric heat ducts. Brown further testified that the temperature of the coils in the heat ducts varies depending upon the airflow; with no airflow, the temperature can be 1,200 or 1,400 degrees Fahrenheit, but with airflow, the temperature is about 300 or 400 degrees Fahrenheit.

During direct examination, Brown was asked whether he conducted any tests to determine if interior duct insulation would work in the Perry system, and he answered in the affirmative. At that point, the jury was excused and the court announced that it would conduct "what could be termed a Daubert hearing" because Perry's counsel had "alerted" the court that "he feels that the test run by this expert will not meet the standards of Daubert." See *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). The objection or comment which apparently prompted the hearing does not appear in the record. In response, Durable's counsel stated for the record that the "objection" was raised only on the morning of Brown's testimony and that two photographs depicting Brown's test had

previously been shown to the jury during opening statements without objection.

Out of the presence of the jury, Brown then testified that he attempted to determine if the insulation would burn by hanging the insulation in his laboratory and placing a lighted blow torch at the bottom of the insulation. He testified that based on the color of the flame, the temperature was 1,200 to 1,400 degrees. The flame caused the insulation to melt and disintegrate, but it would not burn. Brown further testified that his test would have exceeded any conditions the insulation would have encountered in the heating unit. He specifically testified that putting airflow on the flame would have caused it to cool. He also testified that he had more oxygen in his laboratory than he would in a duct, so the insulation would be more likely to burn in open air. He noted that the test could not have been any more severe on the material.

Brown testified that he had discussed his test methodology with another fire investigator, but he was unaware of any published peer review. He opined that there was "zero possibility of an error" in his test. He admitted that he had not done other tests on insulation. Brown further testified that any dust or lint on the insulation would have simply burned off and not affected his test.

After Brown's testimony, which the district court characterized as an "offer of proof," the court asked Perry's counsel to state his objection to Brown's testifying that he had put the insulation to a blow torch. Counsel objected on grounds that the test was not scientific and that it did not accurately reflect the conditions in this case. The court refused to allow Brown to testify regarding his test, stating:

> I guess . . . what I'm having trouble with is under Daubert you have to have "the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation." We don't know if the material he used was one of the same age as the material that burned. We don't know if the temperature in the duct was the same as the temperature in his office. We don't know how much oxygen was in the duct compared to the oxygen in his office. I don't think this meets — I know what you're saying about it just being a common sense test, but I think Daubert requires if you're going to put in expert testimony, then it's got to be

expert testimony, not common sense. It's expert testimony. . . . And I'm going to exclude the evidence on him putting the blow torch to it because we don't have any evidence it's the same temperature, same conditions. I don't think it meets the standards of <u>Daubert</u>, and so I'm going to rule that you cannot present that evidence to the jury.

In response to defense counsel's request for clarification of its ruling, the court stated: "You can ask [Brown] if he ran a test, yes, no. You can ask him if based on his expert opinion whether — you can ask him — you can't ask him about the fact he put a blow torch to it and it wouldn't burn." The court further stated that defense counsel would be permitted to ask Brown if the insulation would burn. Perry's counsel then stated that he would have a foundational objection to that question. After hearing additional argument, the court ruled:

I'll let him state his opinion because he said he looked at all the other evidence, and so he has been qualified as an expert in this area based on his experience. And he is entitled to express his opinion. You just cannot bring up that test because I'm ruling that this test is not scientific and does not conform with <u>Daubert</u>.

When Brown's direct examination resumed in the presence of the jury, he testified that the insulation was made of fiberglass and that fiberglass was not combustible and would not burn. Over a foundational objection, Brown testified that the cause of the fire was "accidental" and that there was insufficient information to determine the ignition source of the fire.

The jury returned a verdict in favor of Perry in the amount of $960,840. Durable filed a motion for judgment notwithstanding the verdict or, in the alternative, a motion for new trial. This motion asserted, inter alia, that the court erred in not permitting Brown to testify regarding the tests he performed and "in allowing [Perry] to make a *Daubert* style motion on the fourth day of trial, minutes before the testimony of [Brown] and in sustaining said motion." The motion was overruled, and Durable filed this appeal, which we moved to our docket on our own motion pursuant to our authority to regulate the caseloads of the appellate courts of this state. See Neb. Rev. Stat. § 24-1106(3) (Reissue 1995).

## ASSIGNMENT OF ERROR

Durable assigns, restated and consolidated, that the district court abused its discretion in excluding Brown's expert testimony concerning the torch test he performed on the insulation.

## STANDARD OF REVIEW

■ A trial court's ruling in receiving or excluding an expert's testimony which is otherwise relevant will be reversed only when there has been an abuse of discretion. *State v. Leibhart, ante* p. 133, 662 N.W.2d 618 (2003); *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001).

■ A motion for new trial is addressed to the discretion of the trial court, whose decision will be upheld in the absence of an abuse of that discretion. *McClure v. Forsman, ante* p. 90, 662 N.W.2d 566 (2003); *Macke v. Pierce, ante* p. 9, 661 N.W.2d 313 (2003); *Hamilton v. Nestor*, 265 Neb. 757, 659 N.W.2d 321 (2003).

■ A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrain from acting, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Leibhart, supra; Schafersman, supra.*

## ANALYSIS

■ Trial of this case commenced on April 22, 2002. In *Schafersman*, 262 Neb. at 232, 631 N.W.2d at 876, we directed that in trial proceedings commencing on or after October 1, 2001, "the admissibility of expert opinion testimony under the Nebraska rules of evidence should be determined based upon the standards first set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)." We characterized the *Daubert* standards as requiring "proof of the scientific validity of principles and methodology utilized by an expert in arriving at an opinion in order to establish the evidentiary relevance and reliability of that opinion." *Schafersman*, 262 Neb. at 225, 631 N.W.2d at 872. The *Daubert* standards apply not only to "scientific" knowledge, but to all types of expert testimony. *Schafersman, supra*, citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). See,

also, *Leibhart, supra.* The *Daubert* standards are used to evaluate "the *admissibility* of expert opinion testimony." (Emphasis supplied.) *Schafersman,* 262 Neb. at 231, 631 N.W.2d at 876. *Daubert* does not require that courts "reinvent the wheel" each time that evidence is adduced. *Schafersman,* 262 Neb. at 228, 631 N.W.2d at 874. The level of inquiry in a *Daubert* hearing may vary depending upon the nature of the expert testimony challenged. *Leibhart, supra.* Once the validity of the expert's reasoning or methodology has been satisfactorily established, any remaining questions regarding the manner in which that methodology was applied in a particular case will generally go to the weight of such evidence. *Leibhart, supra*; *Schafersman, supra.*

■ In this case, the trial court permitted Brown to state his opinion that fiberglass insulation was not combustible. However, relying upon *Daubert,* the court excluded evidence of the test, or experiment, which Brown had conducted in arriving at this opinion. Evidence relating to an illustrative experiment is admissible if a competent person conducted the experiment, an apparatus of suitable kind and condition was utilized, and the experiment was conducted fairly and honestly. *Ford v. Estate of Clinton,* 265 Neb. 285, 656 N.W.2d 606 (2003). It is not essential that conditions existing at the time of the experiment be identical with those existing at the time of the occurrence, but the conditions should be essentially similar, that is, similar in all those factors necessary to make the comparison a fair and accurate one. *Id.*; *Kudlacek v. Fiat S.p.A.,* 244 Neb. 822, 509 N.W.2d 603 (1994); *Shover v. General Motors Corp.,* 198 Neb. 470, 253 N.W.2d 299 (1977). The lack of similarity regarding the nonessential factors then goes to the weight of the evidence rather than to its admissibility. *Kudlacek, supra.*

The distinction between admissibility and weight of expert testimony is critical to our analysis of this case. At the point in the trial when Perry sought to exclude evidence concerning the test conducted by Brown, the evidence had already been admitted through the following direct examination of Wineman, Perry's own expert:

> Q Now, there was some testing done by . . . Brown, an expert retained by the defendant in this case. Were you provided with . . . Brown's deposition?

A Yes.

Q And were you provided — did that deposition detail his testing of insulation?

A Yes.

Q Could you tell us briefly what he did to test the insulation?

A To the best of my memory, he had the insulation in open air, and he ignited one end with a torch and put — was — and it didn't burn.

Wineman was then asked to give an opinion "as to whether the testing procedure done by . . . Brown would accurately indicate the burning capability of this insulation." Wineman responded that in his opinion, the test was inaccurate, and then explained his reasoning.

As a result of this testimony adduced by Perry during its case in chief, the methodology and results of Brown's test were received in evidence and made known to the jury. By utilizing a strategy of adducing this evidence in order to rebut it through direct examination of its own expert, Perry effectively waived any objection to its admissibility. The only remaining issue was the weight, if any, which the evidence should be given in determining the cause of the fire. In this regard, the jury heard Wineman's opinion that Brown's test did not produce accurate results, but the court's subsequent ruling prevented the jury from hearing Brown's reasons for believing the test to be accurate and for relying upon the result in forming his opinion that the insulation material would not support combustion. By erroneously excluding Brown's testimony concerning test results which Perry's expert had already identified and impugned, the district court unfairly restricted the jury's ability to determine the probative weight of such evidence as a basis for Brown's expert opinion. Inasmuch as the cause of the fire was a critical issue of fact in the case, such error affected a substantial right of Durable and necessitates a new trial.

Because we conclude that Perry waived any objection to admissibility of the test results by adducing the evidence through its expert in its case in chief, we do not reach the issue of whether the evidence could have been excluded if a timely objection under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,

509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), or other objection had been made.

## CONCLUSION

The district court erred in ruling that Durable's expert could not testify concerning the results of his test which Perry had previously placed in evidence through the testimony of its own expert. Accordingly, the district court abused its discretion in denying Durable's motion for new trial. The judgment of the district court is therefore reversed, and the cause is remanded for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.