IN-LINE SUSPENSION, INC., AND GARY DETWEILER, APPELLEES AND CROSS-APPELLANTS, V. WEINBERG & WEINBERG, P.C., AND MAYNARD H. WEINBERG, APPELLANTS AND CROSS-APPELLEES.

687 N.W.2d 418

Filed October 5, 2004. No. A-02-1057.

Francie C. Reidmann and Thomas A. Grennan, of Gross & Welch, P.C., for appellants.

Terry C. Dougherty and Kara E. Mickle, of Woods & Aitken, L.L.P., for appellees.

INBODY, CARLSON, and MOORE, Judges.

INBODY, Judge.

## I. INTRODUCTION

In-Line Suspension, Inc. (In-Line), and Gary Detweiler filed a professional negligence action against Weinberg & Weinberg, P.C. (the law firm), and Maynard H. Weinberg for alleged malpractice in revising In-Line's employee pension plan. Following a trial, the jury found in favor of In-Line and Detweiler and awarded damages in the amount of $46,293.33. The law firm and Weinberg have appealed the verdict on several grounds.

## II. STATEMENT OF FACTS

Detweiler is the president of In-Line, a business specializing in brake work, installation of shocks, performing alignments, and repairing and rebuilding suspension systems of cars, trucks, motor homes, and trailers. In-Line is a Nebraska subchapter S corporation, and Detweiler and his wife are the sole stockholders of In-Line.

In-Line employs between 8 and 11 employees. The employees can be separated into two groups, salaried employees and sales personnel who receive commissions based on the amount of their sales. As a general rule, the commissioned employees receive

larger amounts of income than the salaried employees. In the mid-1980's, Detweiler decided to create a pension and profit-sharing plan as a benefit for In-Line's long-term salaried employees in appreciation for their hard work and loyalty. Detweiler approached his personal investment advisor, Rob Nixon, who was then a stockbroker, about creating such a pension and profit-sharing plan. Nixon recommended Weinberg to draft the pension plan documents. Weinberg is an attorney licensed to practice law in Nebraska and Iowa and at all times pertinent hereto practiced with the law firm, specializing in employee retirement law.

In 1986, Detweiler contacted Weinberg by telephone and retained him to draft an individually designed pension and profit-sharing plan. Weinberg drafted the initial 69-page plan and a 12-page adoption agreement for In-Line and mailed those documents to Detweiler for execution. Under the initial plan drafted by Weinberg, the plan was available to all employees except commissioned employees. On October 13, Detweiler and his wife signed the plan and adoption agreement as trustees and officers of In-Line, with the plan and adoption agreement being retroactively effective to July 1, 1986. The Internal Revenue Service approved the plan on or about April 7, 1987.

In 1990, Nixon felt that In-Line needed to include one commissioned employee as a salaried individual to make the plan qualify for that year. Although Detweiler was uncomfortable with it, he did follow Nixon's suggestion. Weinberg amended the plan accordingly to state:

The Plan is extended by the company to:

. . . All employees of the company, excluding all commissioned employees. [As of July 1, 1989, Doug Fulton is considered salaried, as are all commission people. This is a test program. They may revert to commission status. Currently, only one former commission salesperson is in the plan—Doug Fulton.]

Weinberg sent the 1990 amendment to In-Line, and it was signed by both Detweiler and his wife as trustees and officers of the corporation. In 1991, employee Doug Fulton, named in the amendment, went back to being considered a commissioned employee.

In 1994, Nixon ceased serving as In-Line's pension plan administrator and In-Line transferred the plan's administration duties to Vanee Jones. At that time, Detweiler provided to Jones what he understood to be a copy of the current In-Line plan documents. As the plan's administrator, Jones was responsible for calculating the plan contributions that should be made each year for each employee. These contributions were made each year through 1998, for all qualified personnel, pursuant to the terms of the plan as Detweiler understood them.

On May 20, 1997, Weinberg forwarded to In-Line, for signed approval, an amended plan consisting of 101 pages and an adoption agreement consisting of 24 pages. When Weinberg did not receive the signed documents in return, he sent a followup letter on June 18 advising Detweiler, "If you did not receive the plan revisions or there are changes or deletions, please contact us immediately. If you have any questions, please feel free to call."

Shortly after receiving the June 18, 1997, letter, both Detweiler and his wife signed the documents as trustees and officers of In-Line and returned the originals to Weinberg. The amended adoption agreement as signed by the Detweilers, which provided for extension of the plan to all employees without exception, became effective on July 1.

In the early part of 2000, Jones inquired as to whether an updated plan existed, at which time Detweiler provided her with a copy of the 1997 plan and adoption agreement from his files. Shortly thereafter, Jones informed Detweiler that the 1997 plan and adoption agreement included commissioned employees and that In-Line had been excluding commissioned employees in its pension contribution.

As a result of In-Line's failure to comply with the 1997 plan changes, In-Line was required to make contributions for 1997 and 1998 for its commissioned employees plus pay fees assessed by the Internal Revenue Service and interest on the delayed contributions. In-Line also incurred legal fees for redrafting of the plan to exclude commissioned employees. Also, the decision was made not to make a contribution in 1999 for any of In-Line's employees, including Detweiler, in order to avoid an additional year's contribution for the commissioned salespeople.

On November 21, 2000, Detweiler and In-Line filed a professional negligence action against Weinberg and the law firm for alleged malpractice in drafting revisions to In-Line's plan in that the revisions drafted by Weinberg brought coverage under the plan to commissioned employees who had not previously been covered and for whom Detweiler did not intend to make pension contributions. The petition further alleged that said revisions were not legally required and that Weinberg failed to adequately warn or advise Detweiler of the effect of the revisions, to wit, that In-Line would be required to make pension contributions for employees for whom Detweiler did not intend to make such contributions.

Detweiler and In-Line sought total special damages of $55,458 consisting of damages of $38,833 for the pension contributions for employees brought into the plan by the revisions, $10,125 for loss of value to Detweiler and In-Line in the amount that would have been contributed to the plan in 1999, and $6,500 in costs and fees, including incurred and anticipated legal and accounting fees and fees paid to the Internal Revenue Service to investigate or revise the plan to correct the problems created by the revisions.

Weinberg and the law firm answered the petition, generally denying the allegations, including that of a violation of the standard of care, and further alleging that Detweiler and In-Line's claims were barred by the statute of limitations and that Detweiler and In-Line's own negligence was the proximate cause of any loss or damage suffered. Weinberg and the law firm then filed an amended answer which reiterated the allegation that Detweiler and In-Line's injuries and damages, if any, were proximately caused by the conduct of third parties over whom Weinberg and the law firm exercised no control or right of control.

On February 1, 2001, the district court filed a progression order which provided, in pertinent part:

> 7. **Expert Witnesses.** At least 90 days prior to November 30, 2001, any party who intends to call an expert as a witness in the case shall disclose the expert to all opposing parties. Any expert who is to be called solely to respond to the testimony of an expert witness of an opposing party must be

disclosed to all opposing parties at least 60 days prior to November 30, 2001. The disclosures required in this paragraph shall identify the proposed expert, including, without limitation, the name, address, phone number, curriculum vitae and a listing of all publications authored by the expert which contain any discussion of concepts the expert will use in expressing his or her opinions in this case. The disclosure shall further contain a complete statement of the opinion to be rendered and the basis therefor.

On August 28, 2001, pursuant to the progression order, Weinberg and the law firm designated Stuart M. Lewis as an expert witness and attached to the designation document the following items: Lewis' curriculum vitae, a list of publications authored by Lewis, and a report authored by Lewis setting forth the opinions to be rendered by Lewis and the basis for such opinions. In the report, Lewis concluded that "Weinberg fully complied with the standard of care applicable in this circumstance to a lawyer on matters involving pension plans."

On September 13, 2001, Weinberg and the law firm filed a motion for summary judgment which was denied by the court on October 22. Trial in this matter was held on May 28 through 31, 2002. Detweiler testified that he never spoke to Weinberg about the possibility of altering the plan's scope of coverage and did not discover that the plan had been amended to include commissioned employees until February or March 2000, when Jones brought the revision to his attention.

Also as part of their case in chief, Detweiler and In-Line called Greg Renz, an employee benefits attorney, to testify as an expert witness. Renz testified that based on Detweiler's description of the communications between himself and Weinberg surrounding the 1997 revisions to the plan, his opinion was that Weinberg breached the standard of care for attorneys both in drafting the plan documents to include commissioned employees when this was against Detweiler's wishes and in failing to alert Detweiler of this change in one of the basic plan provisions.

At the close of Detweiler and In-Line's case in chief, Weinberg and the law firm moved for a directed verdict in part upon the bases that Detweiler and In-Line's damages were solely

and proximately caused by their own negligence and that the statute of limitations had run. This motion was denied, and Weinberg and the law firm presented their evidence.

Weinberg testified that in 1997, he recommended a standardized plan to include all employees, in order for In-Line to avoid potential federal violations dealing with highly compensated employees. According to Weinberg, Detweiler agreed with that recommendation. Further, according to Weinberg, prior to the 1997 amendment, In-Line never advised him that it was reverting to treating commissioned salespeople as anything other than salaried employees.

In Weinberg and the law firm's case in chief, Lewis was called to testify as an expert witness. Lewis is an attorney who concentrates on both tax work and employee benefits work. On the basis that Lewis' reports did not address the issue of what constituted the applicable standard of care, Detweiler and In-Line's counsel objected to any testimony by Lewis regarding the applicable standard of care and whether Weinberg met that standard. The court sustained the objection, stating, "I do not view that these reports address [the] standard of care that [was] required of . . . Weinberg." Further, the court stated, with regard to exhibit 181, the report in which Lewis concluded that Weinberg did meet the standard of care, "I don't see that it addresses what the standard of care is. It addresses what happened and it addresses conclusions that [Lewis] has drawn from what he has been informed, but it does not address what is the standard of care in this situation."

In response, Weinberg and the law firm's counsel offered Lewis' deposition, which contained the following questions by Detweiler and In-Line's counsel and answers by Lewis:

Q I would assume, and correct me if I'm wrong, that you would be of the opinion that if a practitioner were going to change a plan from a nonprototype plan to a standardized prototype plan . . . you would want that practitioner to advise his or her client of that fact, correct?

A I think that would be the best course of conduct. Yes.

Q Would you expect such a pension practitioner operating within the applicable standard of care to so advise his or her client?

A Typically. There might be exceptions. If, keeping in mind that the person that's presented with a document that they should be reading, especially if they are going to be a fiduciary of the document, I think there is a certain duty on the person executing the document to be aware of what's in the document. And so to some degree just giving him a document is giving him notice of a change. But the best course of conduct would be to specifically bring it to their attention.
. . . .

Q . . . If you are changing someone from an individually designed plan to a standardized prototype plan, you would provide that plan owner with notice of that change, correct?

A Certainly.

Q You would do that by some method other than simply presenting them with the document and saying go read it; wouldn't you?

A Typically yes.

Q Have there been instances when that was all you provided them was just say here's the plan as I want to do it. Go read it?

A It's a matter of degree and issue in the sense that there are — whenever you redo a document there are a multiple [sic] of changes. Some are very subtle, some are more dramatic. I certainly would make an effort to give them some notification separate from the document of the more dramatic changes but I wouldn't necessarily try to tell them each and every change in the document. I would rely on the client. What I typically do is I provide them with the document, and then I offer to meet with them, and go through the document line by line if they want to review every change in the document, or if they have questions about it and so forth. But I would bring to their attention major changes, yes.

Q But would you classify going from excluding particular classifications of employees into inputting them to be a major change?

A Typically yes.

Q If you are going through the trouble of writing someone a letter outlining changes that you had made to their plan and one of those changes was that now whereas certain

categories of employees were excluded they are now going to be included. Wouldn't you include that in this written letter that you would give to your client?

A If the letter is intended to be comprehensive, yes. I mean, if I'd had an extensive discussion or I had felt the matter had been already covered, it's possible that I wouldn't raise it in the letter.

Other questioning of Lewis by Detweiler and In-Line's counsel dealt with the standard of care:

Q . . . What would you have done if you had requested data, whether it be census data and employee biographical information, whatever, from In-Line . . . and it had not been provided and therefore you did not have the information you needed to assess the plan's ability to meet minimum coverage requirements. What would you have done?

A I'm not sure what I would have done, but I think what . . . Weinberg did was certainly reasonable to provide a document that will qualify. They still had the option of saying we don't want to do that. . . .

Q Well you are going to testify as an expert witness and I guess what I want to know is whether or not you will be opining about whether it was or was not reasonable for . . . Weinberg to do what he did when he did not receive, as he alleges, the requested information. Will you be opining on that?

A If asked, I will opine that I think that was a reasonable course of conduct.

Q To provide a standardized prototype plan?

A Yes.

Q In that situation, we talked earlier about the fact of whether or not you would point out the change that was being made. I assume if your response to not getting data was to provide a standardize[d] prototype plan, if anything that makes it more important to point out the changes in the plan, correct?

A I agree that . . . the advisable course of conduct would be to point out the major changes.

Q Would you expect a practitioner operating within the applicable standard of care to so advise their client in that circumstance?

A As I answered I think earlier on, generally, yes. I mean you have to look at it in the context of the situation but I think generally yes. I mean the person does have the plan document which raises the point itself but the best course of conduct would be to point it out specifically. So make sure the client was aware of it.

Detweiler and In-Line's counsel further questioned Lewis:

Q Do you have any opinions as to whether or not . . . Weinberg's communication with his clients met the applicable standard of care in this particular situation?

A Based on the pleadings and the assumptions that we've already talked about, my opinion is that it did meet the applicable standard of care.

The district court maintained its ruling, stating:

I will refer to the progression order that was entered in this case on February 8th of 2001, paragraph 7, it says: "The disclosure shall further contain a complete statement of the opinion to be rendered and the basis therefor."

And in my view the contents of [the exhibit 181] report do not include any opinion on this by [Lewis] as to what the standard of care ought to be in this circumstance.

Weinberg and the law firm's counsel made an offer of proof that if allowed to testify, Lewis would testify that "Weinberg totally complied with the standard of care applicable in the circumstances to a lawyer on matters involving qualified retirement plans."

At the close of all of the evidence, Weinberg and the law firm renewed the motion for a directed verdict, which was again denied by the court. During the jury instruction conference, Detweiler and In-Line requested that the jury be instructed that one element of the damages to be considered was the additional federal and state income tax that In-Line was required to pay for the taxable year 1999 because there was no pension plan contribution made to the account in 1999.

On May 31, 2002, the jury returned a verdict for Detweiler and In-Line, awarding damages of \$46,293.33. In so doing, the jury necessarily found against Weinberg and the law firm on their claim that Detweiler and In-Line's claims were barred by the applicable statute of limitations.

On June 10, 2002, Weinberg and the law firm filed a motion for remittitur and judgment notwithstanding the verdict or, in the alternative, for new trial. On August 14, the district court denied this motion in its entirety. Weinberg and the law firm have timely appealed to this court.

### III. ASSIGNMENTS OF ERROR

On appeal, Weinberg and the law firm's assignments of error, consolidated and restated, are as follows: The trial court erred in (1) overruling their motion for summary judgment, (2) failing to find that Detweiler and In-Line's petition was barred by the statute of limitations as a matter of law, (3) excluding Lewis' expert testimony regarding the applicable standard of care, and (4) failing to grant their motion for directed verdict or their motion for judgment notwithstanding the verdict on the basis that Detweiler's failure to read the adoption agreement or seek interpretation of it was the proximate cause of Detweiler and In-Line's damages. Weinberg and the law firm further contend that the damages awarded by the jury do not reflect tax consequences and are therefore excessive and that consequently, the district court erred in overruling Weinberg and the law firm's motion for remittitur or for new trial on this basis.

On cross-appeal, Detweiler and In-Line contend that the district court erred in failing to give a requested jury instruction regarding In-Line's additional federal and state income tax liability for 1999.

### IV. ANALYSIS

#### 1. APPEAL

##### (a) Denial of Motion for Summary Judgment

Weinberg and the law firm's first assignment of error is that the district court erred in denying their motion for summary judgment. This issue is not properly before this court because " '[t]he denial of a summary judgment motion is neither appealable nor

reviewable.'" *Moyer v. Nebraska City Airport Auth.*, 265 Neb. 201, 208, 655 N.W.2d 855, 862 (2003) (quoting *McLain v. Ortmeier*, 259 Neb. 750, 612 N.W.2d 217 (2000)). Therefore, we decline to consider this assigned error.

### (b) Statute of Limitations

Weinberg and the law firm's next assigned error is that the trial court erred in failing to find as a matter of law that Detweiler and In-Line's petition was barred by the statute of limitations.

Neb. Rev. Stat. § 25-222 (Reissue 1995) provides, in pertinent part:

> Any action to recover damages based on alleged professional negligence or upon alleged breach of warranty in rendering or failure to render professional services shall be commenced within two years next after the alleged act or omission in rendering or failure to render professional services providing the basis for such action; *Provided*, if the cause of action is not discovered and could not be reasonably discovered within such two-year period, then the action may be commenced within one year from the date of such discovery or from the date of discovery of facts which would reasonably lead to such discovery, whichever is earlier.

While the question of which statute of limitations applies in a particular case should be decided as a matter of law, "[t]he point at which a statute of limitations begins to run must be determined from the facts of each case, and the decision of the district court on the issue of the statute of limitations normally will not be set aside by an appellate court unless clearly erroneous." *McGinley v. McGinley*, 7 Neb. App. 410, 412-13, 583 N.W.2d 77, 79 (1998). If the facts in a case are undisputed, the issue as to when the professional negligence statute of limitations began to run is a question of law. *Reinke Mfg. Co. v. Hayes*, 256 Neb. 442, 590 N.W.2d 380 (1999).

In the instant case, the district court determined as a matter of law that the professional negligence statute of limitations applied. Since the action was not filed by Detweiler and In-Line within the 2-year statute of limitations period, the question then becomes whether the discovery exception is applicable. Weinberg and the law firm argue that the discovery exception is

not applicable, because the change in the plan that constitutes the alleged act of professional negligence could have been discovered during the 2-year statute of limitations period if Detweiler had read the documents provided to him.

A similar situation was considered by the Nebraska Supreme Court in *Interholzinger v. Estate of Dent*, 214 Neb 264, 333 N.W.2d 895 (1983), wherein the court discussed the issue of whether the discovery exception to the statute of limitations applies where a client signs an instrument without reading it. The court set forth the boilerplate law that "in the absence of fraud one who signs an instrument without reading it, when he can read and has the opportunity to do so, cannot avoid the effect of his signature merely because he was not informed of the contents of the instrument." *Id*. at 271, 333 N.W.2d at 899. Thus, the court charged one plaintiff with knowledge of a document listing property for sale which he signed, regardless of whether he read the document. However, the court determined that it was inappropriate to grant summary judgment based on the discovery rule where there was a question of fact concerning a different plaintiff's inability to read the document. Compare *Smith v. Ganz*, 219 Neb. 432, 363 N.W.2d 526 (1985) (discovery exception not applied in legal malpractice case where husband knew from date when property settlement agreement was signed that he was named as owner of undivided one-half interest in certain real estate as tenant in common and "discovery" allegedly occurred when ex-wife as other tenant in common filed partition action).

The instant case differs from *Interholzinger v. Estate of Dent, supra*, and *Smith v. Ganz, supra*, because there is no evidence that Detweiler was unable to read the plan documents. However, since the instant case involves complex legal documents, we consider whether complexity may be considered in whether the general rule should be applied.

In *Medtech. Corp v. Indiana Ins. Co.*, 555 N.E.2d 844 (Ind. App. 1990), the Indiana Court of Appeals held that while an insured generally has a duty to become familiar with the contents of an insurance policy, an insured's reasonable reliance upon an agent's representations which contradict the terms of the policy may circumvent the insured's obligation to read the policy. The court reasoned that given the complexity of insurance documents,

an insured should not be held to have read the terms of an insurance policy at least when an insurance agent has made representations as to the contents of the policy which conflict with the express terms of the policy. Since the court concluded that it could not determine as a matter of law that an insured's reliance upon such representations was unreasonable, it accordingly held that whether such reliance is reasonable is a question of fact.

In the instant case, there is no question that the documents involved were complex. Further, although Detweiler and In-Line claim that Weinberg did not inform Detweiler of changes in the plan, Weinberg testified that he did have conversations with Detweiler regarding adding commissioned employees to the plan and that Detweiler approved the changes to the plan. Thus, the instant case presented a factual question which the district court properly left for the jury to decide. Consequently, the trial court did not err in refusing to decide the statute of limitations issue as a matter of law.

### (c) Expert Testimony Regarding Standard of Care

Next, Weinberg and the law firm contend that the trial court erred in excluding testimony from Lewis regarding the applicable standard of care and that the court should have granted their motion for a new trial on the basis of this wrongly excluded evidence. A trial court's ruling in receiving or excluding an expert's testimony which is otherwise relevant will be reversed only when there has been an abuse of discretion. *Carlson v. Okerstrom*, 267 Neb. 397, 675 N.W.2d 89 (2004); *Perry Lumber Co. v. Durable Servs.*, 266 Neb. 517, 667 N.W.2d 194 (2003); *State v. Leibhart*, 266 Neb. 133, 662 N.W.2d 618 (2003). A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrain from acting, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Perry Lumber Co. v. Durable Servs., supra.*

At trial, Detweiler and In-Line's counsel objected to any testimony by Lewis regarding whether Weinberg met the standard of care for attorneys in the circumstances herein, on the basis that Lewis' reports did not address the issue of what constituted that

standard. The court sustained the objection because the court likewise did not view the reports as addressing what constituted the standard of care required of Weinberg. In response, Weinberg and the law firm's counsel offered Lewis' deposition, but the court maintained its ruling because the earlier progression order had required a complete statement of the opinion to be rendered and the basis of that opinion but the court found that Lewis' report did not include any opinion as to what the standard of care ought to have been.

We believe that this situation is best analyzed within the framework of a discovery violation.

> In determining whether to exclude testimony of an expert witness called by a party who has failed to comply with a request for discovery, the trial court should consider the explanation, if any, for the party's failure to respond, or respond properly, to a request for discovery concerning an expert witness; importance of the expert witness' testimony; surprise to the party seeking preclusion of the expert's testimony; needed time to prepare to meet the testimony from the expert; and the possibility of a continuance.

*Norquay v. Union Pacific Railroad*, 225 Neb. 527, 540, 407 N.W.2d 146, 155 (1987). Accord *Brown v. Hansen*, 1 Neb. App. 962, 510 N.W.2d 473 (1993).

In the instant case, there was no element of surprise. Lewis' report stated his opinion that Weinberg met the standard of care, and Detweiler and In-Line's counsel questioned Lewis during the deposition regarding the standard of care. Further, the importance of the standard of care in this case is highlighted by Detweiler and In-Line's counsel's statements during closing argument:

> Standard of care. The evidence in this case is unrebutted that . . . Weinberg, if you believe . . . Detweiler's factual basis . . . did not meet the standard of care. And there is specific testimony from . . . Renz on that. [Weinberg] changed [the plan documents] without getting [Detweiler's] permission, he changed them when that change was not required by the law and he failed to give [Detweiler] warning of that.

The exclusion of Lewis' testimony regarding the standard of care deprived Weinberg and the law firm of a substantial

right, and thus, it follows that the trial court erred in overruling their motion for a new trial. "A motion for new trial is to be granted only when error prejudicial to the rights of the unsuccessful party has occurred." *Bradley T. & Donna T. v. Central Catholic High Sch.*, 264 Neb. 951, 957, 653 N.W.2d 813, 818 (2002). Consequently, the trial court's decision must be reversed and this matter remanded for a new trial.

### (d) Other Issues Raised by Weinberg and the Law Firm

■ Weinberg and the law firm also assigned as error that the district court erred in failing to grant the motion for directed verdict or the motion for judgment notwithstanding the verdict. Weinberg and the law firm also claim that the district court erred in overruling the motion for remittitur or for new trial, because the damages awarded by the jury do not reflect tax consequences and are excessive. Having found that we must reverse and remand, we need not address these issues. See *Kelly v. Kelly*, 246 Neb. 55, 516 N.W.2d 612 (1994) (appellate court is not obligated to engage in analysis which is not necessary to adjudicate case and controversy before it).

### 2. CROSS-APPEAL

On cross-appeal, Detweiler and In-Line contend that the district court erred in failing to give a requested instruction regarding In-Line's additional federal and state income tax liability for 1999 which was incurred because no pension plan contribution was made to the account in 1999. Having found that we must reverse and remand, and since we do not know what evidence will be presented upon retrial, we do not address this issue. See *Kelly v. Kelly, supra* (appellate court is not obligated to engage in analysis which is not necessary to adjudicate case and controversy before it).

### V. CONCLUSION

Having found that the district court erred in excluding Lewis' expert testimony regarding the standard of care, we must reverse the court's decision and remand the cause for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.